The FIRST NATIONAL BANK IN OLNEY, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 15484.

United States Court of Appeals Seventh Circuit.

Sept. 15, 1966.

Walter J. Rockler, David R. Kentoff, Cotton, Watt, Rockler & Jones, Chicago, Ill., for appellant.

Richard M. Roberts, Asst. Gen. Counsel, Tax Division, Lawrence B. Silver, Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KILEY, Circuit Judges.

KILEY, Circuit Judge.

The Tax Court's judgment sustained deficiency assessments against The First National Bank in Olney (Taxpayer), after disallowance of deductions for additions to the Bank's bad debt reserve [1] in the years 1957 through 1960.[2] We affirm the judgment.

Taxpayer, of Olney, Illinois, population about 10,000, was organized July 9, 1934, and has been in the general banking business since that time. Before 1947 it computed its deductions for bad debts by specific chargeoffs. Thereafter it elected, under Mimeograph 6209[3] of the Treasury Department, to change from the specific chargeoff method to the reserve method of accounting for bad debts. In substance, the reserve method in the Mimeograph approved a bank's use, for taxable years beginning after December 31, 1946, of a "moving average experience factor," (determined over a period of twenty years including the taxable year) for determination of the ratio of losses to outstanding loans.

Mimeograph 6209, dated December 8, 1947, was supplemented by Revenue Rul-

---

1. INT.REV.CODE OF 1954, § 166(c): "Reserve for bad debts.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts."

The disallowed deductions (for additions to reserve for bad debts) and the resulting deficiencies determined for the years 1957–1960 inclusive were re-spectively:

| | | | | |
|---|---|---|---|---|
| Disallowed: | $7,646.14; | 10,207.58; | 10,267.69; | 14,856.87 |
| Deficiency: | $3,975.99; | 7,070.44; | 5,330.43; | 7,543.15 |

---

2. First Nat'l Bank v. Commissioner of Internal Revenue, 44 T.C. 764, (Aug. 30, 1965).

3. Mim. 6209, 1947-2 CUM.BULL. 26.

ing 54–148 which provided an alternative method under which a taxpayer-bank could use an average experience factor based on *any* twenty consecutive years of its own experience after 1927.[4] A further supplement, Revenue Ruling 54–597, 1954–2 CUM.BULL. 90, provides that a bank's computation of its loss ratio under Mimeograph 6209 and Revenue Ruling 54–148 may be made on the basis of the total net losses divided by the total outstanding loans for the twenty-year period, *or* on the basis of an average of the total percentages of loss for each year of the period. Under these and the later Revenue Ruling 57–350, 1957–2 CUM.BULL. 144, a bank is permitted for that portion of twenty years it was not in existence to use "the bad debt experience of other similar banks with respect to the same type of loans, preferably in the same locality," and fill in such years with "similar comparable data." Under the Mimeograph and Revenue Ruling 54–148 the total reserve

cannot exceed the ceiling of three times the experience factor applied to the net closing loan balance.[5]

For 1957 through 1960 Taxpayer, by virtue of Mimeograph 6209, as supplemented by the Revenue Rulings, computed its addition to its bad debt reserve by selecting the twenty years from 1929 through 1948, using an experience factor ratio of .0171 to annual net closing balance. That factor is the average of the twenty ratios (or percentages) of net bad debts to the net closing loan balance for each of the twenty years chosen.[6] Since Taxpayer was not in existence until 1934, the twenty years it chose under the rulings for computing its factor extend back beyond its birth. Taxpayer, under the supplementary rulings, used the experience of the Olney Trust and Banking Company, a state institution and the only other commercial bank in Olney, for the years 1929 through 1934. Taxpayer had no bad debt experience in 1934. During the

---

4. Rev.Rul. 54–148, 1954–1 CUM.BULL. 60.

5. For the Taxpayer's years 1957–1960 involved here, the annual addition it could have made to its reserve would have placed the reserve in each year beyond the approved ceiling; therefore its addition to reserve was in each instance only the amount necessary to bring the reserve up to the limitation.

| | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|
| (a) Net closing loan balance* | $1,781,544.98 | $1,977,828.00 | $2,228,051.22 | $2,519,309.29 |
| (b) Bad debt loss experience factor | .0171 | .0171 | .0171 | .0171 |
| (c) Annual limitation ((a) x (b)) | $ 30,464.42 | $ 33,820.86 | $ 38,099.68 | $ 43,080.19 |
| (d) Reserve limitation ((c) x 3) | $ 91,393.26 | $ 101,462.58 | $ 114,299.04 | $ 129,240.57 |
| (e) Reserve before addition | $ 83,747.12 | $ 91,255.00 | $ 104,031.35 | $ 114,383.70 |
| (f) Deductions taken ((d) − (e)) | $ 7,646.14 | $ 10,207.58 | $ 10,267.69 | $ 14,856.87 |

* Net closing loan balance represents the closing loans outstanding at the end of the year, reduced by the amount of "ineligible loans" such as government insured or guaranteed loans. Figures for the net closing loan balance do not include loan amounts which were written off as bad debts during any of the years in question.

---

6. The total of the twenty ratios used by Taxpayer (substituting the experience of the Olney Trust for years 1929–1934) was .342, which, when divided by twenty, yields the experience factor of .0171. Most of the total results from the ratio of .251 in the year 1934.

period from about July, 1933, to August 7, 1934, Olney Trust was closed and in receivership. The Tax Court decided that the Olney Trust experience in that period could not be substituted for the Taxpayer's lack of experience, that Taxpayer had failed to establish compliance with Mimeograph 6209, as supplemented, and that the Taxpayer had failed to show that the deductions taken were reasonable additions to its bad debt reserve, under section 166(c) of the Code, for the years in suit.

The Tax Court, after holding that Taxpayer had not complied with Mimeograph 6209, as supplemented, then held that the Bank's reserve for bad debts as of January 1, 1957, $83,525.97, was adequate and reasonable without any additions thereto for the years 1957 through 1960.

■ The Tax Court correctly stated that the finding of noncompliance did not necessarily decide the issue adversely to Taxpayer. And the parties here agree that the issuance of the Mimeograph and supplementary rulings reflects an exercise by the Commissioner of his discretion under section 166(c), and that if Taxpayer proves compliance with the guidelines in the Mimeograph, as supplemented, the additions to bad debt reserve, properly computed pursuant to the Mimeograph, are presumptively reasonable and allowable under section 166(c), and that the presumption must be overcome by the Commissioner. See Pullman Trust & Sav. Bank v. United States, 235 F.Supp. 317, 323 (N.D.Ill.1963), aff'd per curiam, 338 F.2d 666 (7th Cir. 1964); Central Bank Co. v. Commissioner of Internal Revenue, 329 F.2d 581 (6th Cir. 1964); North Carolina Nat'l Bank v. United States, 345 F.2d 544, 547–549 (Ct.Cl.1965); Revenue Ruling 63–267, 1963–2 CUM.BULL. 99. The court's finding of unreasonableness of the additions before us is unchallenged if the finding of noncompliance is not clearly erroneous, for Taxpayer does not attempt to prove "reasonableness" other than through its alleged compliance.

■ The Taxpayer has not sustained its burden in this court of persuading us that the Tax Court's finding of noncompliance is clearly erroneous.

The Tax Court findings, as expanded in its written opinion, determined that the Taxpayer did not comply with Mimeograph 6209, as supplemented, because there was no showing that the substituted experience used in computing its experience factor for the six years prior to 1935 was that of "other similar banks with respect to the same type of loans," and that the use of the bad debt experience of Olney Trust for the entire year of 1934 was not justified because the Taxpayer was in existence and had its own "zero" experience in bad debt loss for the period from July to the end of 1934.

It is true that the Tax Court found that Olney Trust and the Taxpayer were in the "same locality" serving the same farming community and made "loans of the same classes during the 1930's and 1940's," but we think the court with reason found a lack of proof of a description of the Olney Trust loans in 1929 through 1934 so that the court could determine whether the loans both banks made were comparable in nature and risk. A comparison, made by the court in its findings, of the respective net losses on the loans of both banks for the period 1935–1947 indicates the risk was greater in the Olney Trust portfolio. The finding that the loans were of the same classes means both banks made realty mortgage, automobile, machinery and animal loans.

The Mimeograph, as supplemented, requires that the substituted experience be "commensurate with the average experience of other similar banks." The court found that the Olney Trust was the only other bank whose experience was used; and that it was not similar, at least from about June, 1933, to August,

1934, because it was in receivership, not in business.[7]

■■ The twenty-year cycle was intended as a span that would likely include good as well as bad years in collection of loans, and the permissive substituted past experience of other banks was to enable a taxpayer to determine the probable future net losses so that additions to its bad debt reserve would be sufficient to meet likely uncollectible loans. Accordingly, more than one bank's experience was intended as substituted experience lest one with a relatively distorted loss experience be used as a substitute to bring about relatively distorted ratios between losses and additions to bad debt reserve and result in deductions for unnecessary and unreasonable additions to the reserve.[8]

The Tax Court thought that that undesirable result was brought about here by the Taxpayer's use of the Olney Trust experience alone. Olney Trust's losses were "bunched" in August of 1934 and written off in an amount representing more than 73 percent of the total ratios used by Taxpayer in computing the .0171 factor employed by it in determining its additions. We cannot agree that in these circumstances the Tax Court's interpretation of "other similar banks" was "rigid and restrictive."

We think the Tax Court properly distinguished this court's decision in *Pullman,* where it was held that the old and new banks were virtually one. The result there was that the old bank's experience was effectually that of the new bank. The same distinction lies between the case before us and Union Nat'l Bank of Youngstown v. United States, 237 F.Supp. 753 (N.D.Ohio 1965).

It is true that the Court of Claims in North Carolina Nat'l Bank v. United States, 345 F.2d 544 (Ct.Cl.1965), used the bad debt history of the Bank of Georgia instead of the bad debt average history of the banks in the Fifth Federal Reserve District. But there were special circumstances. The loans in dispute were "timepayment" loans of taxpayer there, and the Bank of Georgia's "consumer" loan history was the only comparable experience available to the court. And the court stated "we are reluctant to use only one bank," noting favorably, however, that the experience figures of both the District and the Bank of Georgia were "so close" that their reluctance lessened. There is nothing in the record here to show that the Olney Trust experience was the only experience available to the Taxpayer in this Federal Reserve District or that it bore any resemblance to the experience of any other banks.

We have considered but need not discuss the other points presented by the Taxpayer.

We conclude that the Tax Court was justified in inferring as it did that the Taxpayer did not show compliance with Mimeograph 6209, as supplemented, and that the court did not err in sustaining the deficiency assessments made by the Commissioner for the years 1957 through 1960.

Affirmed.

---

7. When Olney Trust reopened in August, 1934, it charged off on its books an undescribed group of loans totalling almost $143,000; as substituted experience for 1934, Taxpayer used $56,401.32, which represents the portion of the loans written off in 1934 which was never recovered in later years by Olney Trust.

8. In the latest ruling on the bank bad debt reserve subject, Rev.Rul. 65–92, 1965–1 Cum.Bull. 112, there is set up a uniform reserve percentage of 2.4% of outstanding loans as a reserve ceiling. Unless a bank which already exceeds the ceiling can justify future additions as "reasonable" under § 166(c), no deductions for additions will be allowed until their reserve is lowered below the 2.4% limit. Taxpayer, following previous rulings (the limit was three times the experience factor—here, 1.71%), would have had a reserve of over 5% at the end of 1960 if the additions it sought to add for the years 1957–1960 had been allowed.